IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBRA LYONS,                              )
                                          )
                    Plaintiff,            )
                                          )
                                          )    Civil Action No. 08-801
          v.                              )
                                          )
                                          )
COMMISSIONER OF SOCIAL,                   )
SECURITY                                  )
                                          )
                    Defendant.            )


**MEMORANDUM OPINION**

CONTI, District Judge.

  This is an appeal from the final decision of the Commissioner of Social Security

("Commissioner" or "defendant") denying the claims of Debra Lyons ("plaintiff") for disability

insurance benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 401-

33 and supplemental security income ("SSI") benefits under Title XVI of the SSA, 42 U.S.C. §§

1382-83.  Plaintiff contends that the decision of the administrative law judge ("ALJ") that she is

not disabled, and therefore not entitled to benefits, should be reversed or remanded because the

decision is not supported by substantial evidence.  Defendants assert that the decision of the ALJ

is supported by substantial evidence. The parties filed cross-motions for summary judgment

pursuant to Rule 56 (c) of the Federal Rules of Civil Procedure. The court will not grant

summary judgment in favor of plaintiff or defendant.  The ALJ's decision will be reversed

because it is not supported by substantial evidence and this case will be remanded for

proceedings consistent with this opinion.

**Procedural History**

On February 22, 2005, plaintiff protectively filed applications for DIB and SSI alleging disability since September 23, 2004, due to a cardiac condition, panic disorder, right arm and shoulder pain, right ear hearing loss, chronic obstructive pulmonary disease ("COPD")[1], spinal stenosis[2], carpal tunnel[3], degenerative joint disease[4] ("DJD") in the knees and back, cataracts, and depression.  (R. at 63-66, 446-49.)  Plaintiff's claims were denied on June 2, 2005.  (R. at 31-32, 450-51.)  Plaintiff's case was randomly selected to test modifications to the disability determination process, and the reconsideration step of the administrative review process was

---

[1]"COPD, or chronic obstructive pulmonary . . .  disease, is a progressive disease that makes it hard to breathe. 'Progressive' means the disease gets worse over time.  COPD can cause coughing that produces large amounts of mucus . . . , wheezing, shortness of breath, chest tightness, and other symptoms." http://www.nhlbi.nih.gov/health/dci/Diseases/Copd/Copd_WhatIs.html (last visited June 5, 2009).

[2]"Spinal stenosis is a narrowing of one or more areas in [the] spine — most often in [the] upper or lower back. This narrowing can put pressure on [the] spinal cord or on the nerves that branch out from the compressed areas." http://www.mayoclinic.com/health/spinal-stenosis/ds00515 (last visited June 5, 2009).

[3]"Bound by bones and ligaments, the carpal tunnel is a narrow passageway. . . located on the palm side of [the] wrist. This tunnel protects a main nerve to [the] hand and nine tendons that bend [the] fingers. Pressure placed on the nerve produces the numbness, pain and, eventually, hand weakness that characterize carpal tunnel syndrome." http://www.mayoclinic.com/health/carpal-tunnel-syndrome/DS00326 (last visited June 5, 2009).

[4] "Also known as osteoarthritis, this type of arthritis is caused by inflammation, breakdown and eventual loss of the cartilage of the joints. Among the over 100 different types of arthritis conditions, osteoarthritis is the most common, affecting usually the hands, feet, spine, and large weight-bearing joints, such as the hips and knees." http://www.medterms.com/script/main/art.asp?articlekey=2932 (last visited June 5, 2009).

eliminated and the case went directly to the hearing level.  (R. at 37, 454.)  Plaintiff requested a

hearing, which was held before the ALJ on April 25, 2006.  (R. at 40, 473-500.)  Plaintiff, who

was represented by counsel, testified at the hearing.  (R. at 473-500.) A vocational expert ("VE")

and plaintiff's daughter also testified.  (R. at 501-11.)  On June 13, 2006, the ALJ issued an

unfavorable decision (R. at 12-23) and plaintiff filed a timely request for review with the appeals

council.  (R. at 462-63.)  After a denial of that request on April 30, 2008, and having exhausted

all administrative remedies, plaintiff filed this appeal.

### Plaintiff's Background and Medical History

At the time of the hearing, Plaintiff was fifty-two years old.  (R. at 63.)  She had a high

school education.  (R. at 82.)  In the past, plaintiff had worked as a nurse's assistant.  (R. at 77.)

Plaintiff stopped working on August 23, 2004, due to her "illness, injuries or conditions", which

she reported as being "constantly tired", "short of breath", and experiencing "chest pains."  (R. at

76.)

Medical Evidence

In November 2002, plaintiff suffered a myocardial infarction.  (R. at 122.)  On February

19, 2004, plaintiff was seen by Dr. Gopalan Vasudevan for a follow-up cardiac appointment.

(R. at 154.)  Plaintiff indicated occasional episodes of chest discomfort and pain in the arms and

legs.  (Id.)  She had been asked to stop her Lipitor to determine if that was the cause of her arm

and leg pain, but she noted no difference after discontinuing that medication.  (Id.)  After a

review of plaintiff's cardiac catheterization films, Dr. Vasudevan saw no indications of

significant disease to warrant additional intervention.  (Id.)  Dr. Vasudevan noted his impression

as coronary artery disease with symptoms suggestive of stable angina, bronchial asthma, depression, obesity, hyperlipidemia,[5] and DJD.  (Id.)

On May 27, 2004, plaintiff presented to Dr. Bernard Scherer, her family practitioner, for a follow-up appointment.  (R. at 249.)  On examination, Dr. Scherer noted no issues and indicated that plaintiff's asthma was doing well, as was her coronary disease, which was stable.  (R. at 249.)  Dr. Scherer noted that plaintiff was still having problems with short term memory and had to write things down fairly often, but noted that her memory seemed good while in his office.  (R. at 249.)

On August 16, 2004, plaintiff was admitted to the hospital with chest pains.  (R. at 120.)  Dr. Bernard Scherer noted in his assessment plan that plaintiff had dyspnea[6] and ordered a stress test.  (R. at 121.)  He also noted a history of panic disorder and depression, which was well controlled and asthma/COPD.  (Id.)  An x-ray of the chest was normal.  (R. at 124).  A dual isotope adenosine myocardial scan stress test was also normal.  (Id.)  Dr. Richard Seccof noted that plaintiff's ECG was negative for ischemia.  (R. at 125.)  On August 19, 2004, plaintiff was seen for a follow-up by Dr. Gopalan Vasudevan.  (R. at 151.)  Plaintiff reported infrequent sharp jabbing pains in her chest and continued pain in her legs, which was attributed to spinal stenosis.  (Id.)  Dr. Vasudevan noted his impression as minor coronary artery disease, bronchial asthma,

---

[5] "Hyperlipidemia is an elevation of lipids (fats) in the bloodstream." http://www.americanheart.org/presenter.jhtml?identifier=4600 (last visited June 5, 2009).

[6] "Difficult or labored breathing; shortness of breath." http://www.medterms.com/script/main/art.asp?articlekey=3145 (last visited June 5, 2009).

depression, obesity, hyperlipidemia, spinal stenosis, and neuropathy of lower extremities.  (R. at 151.

On October 14, 2004, plaintiff was seen by Dr. Bruck Hershock for a follow-up appointment for her left knee arthritis.  (R. at 233).  Plaintiff indicated a bit more discomfort than she had been experiencing at previous visits.  (Id.)  Upon examination, Dr. Hershock found no effusion to the knee.  (Id.)  He further indicated that plaintiff's range of movement ("ROM") remained unrestricted, but that, as he previously noted, she had patella femoral crepitance.[7]  (Id.)

On October 22, 2004, plaintiff was admitted for a second time to Latrobe Area Hospital for chest pain.  (R. at 165.)  Plaintiff's examination was normal except for mild wheezing in the lungs.  (R. at 170.)  An x-ray of plaintiff's chest was normal.  (R. at 173.)  An x-ray of plaintiff's lumbosacral vertebra indicated L4-5 and L5-S1 degenerative disc disease[8] with some, mild degenerative facet arthropathy.[9]  (R. at 174.)  On October 26, 2004, plaintiff was transferred to Allegheny General Hospital for a cardiac catheterization.  (R. at 156.)  Plaintiff underwent a coronary arteriography and left ventriculography.  (R. at 156-57.)  The angiography indicated

---

[7]"A clinical sign in medicine characterized by a peculiar crackling, crinkly, or grating feeling or sound under the skin, around the lungs, or in the joints. . . .  Crepitus in a joint can represent cartilage wear in the joint space."
http://www.medterms.com/script/main/art.asp?articlekey=12061 (last visited June 5, 2009).

[8]"The gradual deterioration of the disc between the vertebrae is referred to as Degenerative Disc Disease." http://arthritis.about.com/od/spine/g/ddd.htm (last visited June 5, 2009).

[9]"Facet arthropathy is degenerative arthritis affecting the facet joints in the spine. In the area of the spine where there are facet joints, arthritis pain can develop."
http://arthritis.about.com/od/spine/p/facet_joints.htm (last visited June 5, 2009).

mild coronary irregularities, particularly a small caliber diagonal branch that contained approximately a 40-60% stenosis.  (R. at 156.)  Left ventricular function was normal and Dr. Howard Grill noted that plaintiff's symptoms were likely noncardiac in nature as the partially blocked vessel was small and the lesion noncritical.  (Id.)

On November 9, 2004, plaintiff was seen for a cardiac follow-up by Dr. Seecof. (R. at 254.)  Dr. Seecof noted that plaintiff reported occasional shortness of breath, which he presumed was related to her asthma. He further reported that plaintiff did not have classic angina, but had some nausea and lightheadedness.  (Id.)  Upon examination, Dr. Seecof noted that plaintiff's heart had regular rate and rhythm without audible murmur, rub, gallop or click. He further noted no peripheral edema and no jugular venous distension.  (Id.)  He concluded that plaintiff's mild coronary disease was stable and made no changes to her regime.  (Id.)

On January 8, 2005, plaintiff was seen in the emergency room at Latrobe Area Hospital. (R. at 186.)  Plaintiff reported that when she bent down to pick up a towel off the floor, she had right lower back pain that radiated down both legs to her feet.  (R. at 187.)  Plaintiff underwent an x-ray of the lumbar spine which indicated degenerative change to the lower lumbar spine at L3/4, L4/5, and L5/S1 without spondylolisthesis or spondylolysis.[10]  (R. at 192.)

On January 21, 2005, plaintiff underwent right eye cataract extraction and implant.  (R. at 194.)  On March 8, 2005, plaintiff saw her eye surgeon, Dr. Patrick Lally, for a follow-up examination for her cataract extraction.  (R. at 260.)  He noted that plaintiff's surgery resulted in

---

[10]"Degeneration or deficient development of a portion of the verterbra . . . ."  Stedman's Medical Dictionary, 1678 (27th ed. 2000).

a nice outcome.  (R. at 260.)  On May 3, 2005, plaintiff underwent left eye cataract extraction and implant.  (R. at 332, 383.)  Following the surgery, plaintiff had blurry vision only during reading and was given prescription glasses.  (R. at 330.)

On February 11, 2005, plaintiff returned to Dr. Seecof for a cardiac follow-up and he noted that her status was stable and made no changes to her regime.  (R. at 253.)

On April 12, 2005, plaintiff presented to Dr. Scherer with complaints of leg pain, right arm and shoulder pain, and bilateral hand numbness.  (R. at 419.)  On April 28, 2005, plaintiff underwent an MRI of the cervical spine, which indicated mild right foraminal stenosis at C4/5, minimal disc bulging without central or foraminal stenosis at C5/6, and some potential foraminal stenosis at C6/7.  (R. at 266.)  Plaintiff was referred to Dr. Louis Catalano, a neurologist.  (R. at 420.)

In May 2005 plaintiff underwent a consultative examination by Dr. Duree Ahmed.  (R. at 269-72.)  Plaintiff complained of shortness of breath since 2002, chest pain on and off, trouble going up and down the steps, panic attacks since 2001, and constant knee pain. (R. at 269.)  Dr. Ahmed indicated plaintiff's past medical history as heart problems, hyperlipidemia, depression, panic attacks, hearing problems, spinal stenosis, and degenerative joint disease.  (R. at 269.)  Upon examination, Dr. Ahmed noted that plaintiff had no murmurs or gallop in her heart; no enlargement of the spleen, liver, or kidney; negative edema in the extremities; normal range of motion in the shoulder, elbow, wrist, hip, knee, and ankle; normal gait; normal reflexes; and good behavior, memory, and orientation.  (R. at 271.)  Plaintiff could also rise from a chair, but would not squat due to eye surgery two days prior and instructions from her eye surgeon.  (Id.)

7

Dr. Ahmed completed a functional capacity evaluation for plaintiff.  (R. at 273-76.)  Dr. Ahmed indicated that plaintiff could occasionally lift and carry two to three pounds.  (R. at 273.) He further indicated that plaintiff could stand and walk one hour or less per day; could sit for thirty minutes per day; and could push and pull small objects.  (Id.)  Dr. Ahmed also reported that plaintiff had hearing problems and was affected by poor ventilation, heights, temperature extremes, dust, and humidity.  (R. at 274.)

On June 1, 2005, plaintiff was seen by Dr. Louis Catalano, a neurologist.  (R. at 313-15.) Plaintiff reported right arm and shoulder pain starting two to three years prior to that time, bilateral hand numbness, and night time leg pain.  (R. at 313.)  Plaintiff's physical examination was normal except for impaired auditory acuity and decreased vibration, cold sensation, and pinprick sensation to the knees.  (R. at 314.)  Dr. Catalano noted his impression as polyneuropathy,[11] possible cervical myelopathy, right shoulder pain with biccepital tendonitis, chronic pain syndrome, and livedo reticularis.[12]  (R. at 315.)

On June 2, 2005, Dr. Dilip Kar reviewed plaintiff's records and completed a physical residual functional capacity evaluation. (R. at 300-07.)  Dr. Kar checked boxes indicating that plaintiff could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand and walk for about six hours in an eight-hour workday; sit about six hours in an eight-hour

---

[11]"A generalized disorder of the peripheral nerves." Stedman's Medical Dictionary, 1422 (27th ed. 2000).

[12]"Livedo reticularis is a vascular condition characterized by a purplish mottled discoloration of the skin, usually on the legs. This discoloration is described as lacy or net-like in appearance." http://www.mayoclinic.com/health/livedo-reticularis/an01622 (last visited June 5, 2009).

workday; and was unlimited in her ability to push and pull.  (R. at 301.)  He opined that plaintiff

had no postural, manipulative, visual, communicative, or environmental limitations.  (R. at 302-

03.)  Dr. Kar rejected the opinion of Dr. Ahmed indicating that Dr. Ahmed had based his opinion

on plaintiff's subjective complaints, which were not supported by a totality of the evidence of

record.  (R. at 306.)  Dr. Kar, however, reported that the credibility of plaintiff's statements were

considered, which included, going shopping, climbing five steps, lifting and carrying five

pounds and tying shoes.  (Id.)

On June 14, 2005, Dr. Seecof examined plaintiff during a follow-up cardiac examination.

(R. at 386).  Plaintiff's heart had regular rate and rhythm with normal first and second heart

sounds without audible murmur, rub, gallop, or click. She did not have peripheral edema. Dr.

Seecof concluded that plaintiff's mild coronary artery disease was stable.  (R. at 386.)

On July 26, 2005, plaintiff had a follow-up appointment with Dr. Louis Catalano.  (R. at

310.)  Plaintiff indicated that walking and sitting was painful. An MRI of plaintiff's right

shoulder showed a full thickness rotator cuff tear and bilateral biceps tendonitis with

radiculopathy.[13]  Dr. Scherer indicated that plaintiff had decreased hearing on the right side,

decreased reflexes in the bilateral lower extremities, and decreased sensations in her bilateral

lower extremities.  (R. at 310, 318-19.)  Plaintiff had a normal nerve conduction study of both

lower extremities and a normal electromyogram of both lower extremities.  (R. at 311.)  Dr.

Catalano indicated a diagnosis of polyneuropathy, possible cervical myelopathy, right shoulder

_____

[13] "Disorder of the spinal nerve roots."  Stedman's Medical Dictionary, 1503 (27th ed.
2000).

9

pain with biccepital tendonitis, chronic pain syndrome, livedo reticularis, complete right rotator cuff tear, family history of lupus-mother, and hallucinations, which were being followed by a psychiatrist. (R. at 310.)

On August 16, 2005, Dr. Scherer noted that plaintiff had pain and swelling in her right ankle, swelling in her left ankle, and reduced hearing in her ears. (R. at 408.) On August 19, 2005, plaintiff was seen again by Dr. Scherer for low back pain with radiation down her left leg. (R. at 407.) An MRI of the lumbar spine indicated a small right paracentral protrusion at L4-5, degenerative changes and spondylosis at L3-4 through L5-S1, an anulus bulge, and small extraspinal fluid density collections at L2-3 and L4-5. (R. at 433-34.) On August 31, 2005, Dr. Scherer reported that plaintiff's ankle continued to be swollen. (R. at 403-06, 408-09.) An x-ray showed a heel spur, but no other abnormalities. (R. at 406.)

On December 16, 2005, plaintiff attended a cardiac follow-up examination with Dr. Seecof. (R. at 384.) Plaintiff indicated that she had not experienced recent chest pain, shortness of breath, or palpitations. (Id.) Dr. Seecof noted that plaintiff's physical examination was unchanged from her June 2005 visit and that her mild coronary artery disease was stable. (Id.)

On December 12, 2005, plaintiff underwent arthroscopic surgery on her shoulder. (R. at 389, 425-26.) On January 4, 2006, plaintiff had a follow-up examination with Dr. Bizousky. (R. at 389-90.) Plaintiff reported that she had some pain, but was very pleased with the pain relief associated with the surgery. (Id.) On February 1, 2006, however, plaintiff had a follow-up examination with Dr. Bizousky and reported that her pain was variable from 0-10/10. (R. at

388.) Dr. Bizousky indicated that plaintiff should continue with physical therapy and prescribed Vicodin.[14] (Id.)

On January 19, 2006, plaintiff was referred for a consultation with Dr. Neil A. Braunstein to check for possible lupus. (R. at 422.) Plaintiff's blood and enzyme tests were normal. (R. at 422.) Dr. Braunstein noted that plaintiff did not have the systemic features of lupus. (R. at 423.)

On April 24, 2006, Dr. Scherer completed a physical residual functional capacity questionnaire indicating that plaintiff occasionally or frequently experienced pain that interfered with attention and concentration needed to perform simple work tasks. (R. at 441-45.) He noted that plaintiff was possibly capable of low stress jobs, could sit for more than two hours before needing to get up, could stand for thirty to sixty minutes at a time, and estimated that plaintiff could sit and stand/walk for about one to four hours daily. (R. at 442-43.) He reported that plaintiff would need to take unscheduled breaks during a work day and could occasionally lift ten pounds. (R. at 443.) Dr. Scherer indicated that plaintiff could frequently look down, turn her head right or left, and twist, could occasionally stoop, crouch/squat, and climb stairs; could never climb ladders; and had significant limitations with reaching, handling, and fingering. (R. at 444.) Finally, he reported that plaintiff's impairments could produce "good days" and "bad days" and would require plaintiff to be absent from work more than four days per month. (R. at 444.)

---

[14]Vicodin® is "[h]ydrocodone bitartrate and acetaminophen" and "is an opioid analgesic and antitussive . . . ." Physicians' Desk Reference 510 (62nd ed. 2008). "The most frequently reported adverse reactions include: "lightheadedness, dizziness, sedation, nausea and vomiting." Id. at 511.

11

At the time of the hearing before the ALJ, plaintiff was taking Albuterol, Atenolol, Advair, Lipitor, Isosorbide Mononitrate, Mononitrate, Effexor, Nitrostat sublingual, Lasix, Vicodin, Neurontin, and Amitriptyline. (R. at 486-88.)

Psychological Evidence

On May 17, 2005, plaintiff underwent a consultative psychological exam with Dr. Joel Last. (R. at 280-83.) During the mental status exam, Dr. Last reported that plaintiff had a depressed mood and blunted affect. (R. at 281.) He indicated that plaintiff's thoughts were coherent, goal-directed and logical with no flight of ideas or loose associations. Dr. Last noted that plaintiff's cognition was grossly intact, but that she had difficulty with her memory and could not remember the three words on which he tested her. (Id.) Dr. Last completed a mental capacity evaluation and reported that plaintiff had slight restrictions in her ability to understand and remember short, simple instructions and in carrying out short, simple instructions. He noted that plaintiff had moderate restrictions in her ability to understand and remember detailed instructions; carry out detailed instructions; and make judgments on simple work-related decisions. (R. at 282.)

On March 3, 2006, Dr. Randall Orr, plaintiff's psychologist, completed a mental residual functional capacity questionnaire. (R. at 342-46.) Dr. Orr noted that plaintiff suffered from major depressive disorder and through various appointments had displayed an anxious mood; at times, restricted affect, and poor eye contact. (R. at 342.) Plaintiff's signs and symptoms were listed as follows: 1) anhedonia or pervasive loss of interest in almost all activities, 2) decreased energy; 3) feelings of guilty or worthlessness; 4) mood disturbance; 5) persistent disturbances of

mood or affect; 6) emotional withdrawal or isolation; and 7) recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least one per week.  (R. at 343.)

Dr. Orr indicated that plaintiff's chronic depression and anxiety with recurrent panic attacks would cause her to be unable to meet competitive standards when working in coordination with or proximity to others without being unduly distracted, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without unduly distracting them or exhibiting behavior extremes, and to deal with normal work stress.  (R. at 344.)  He reported that plaintiff would be seriously limited, but not precluded from understanding and remembering detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independently of others, dealing with stress of semiskilled or skilled work, interacting appropriately with the general public, and maintaining socially appropriate behavior.  (R. at 345.)

## **Standard of Review**

Judicial review of the Commissioner's denial of a claimant's benefits is proper pursuant to 42 U.S.C. § 405(g).  This court must determine whether there is substantial evidence which supports the findings of the Commissioner.  42 U.S.C. § 405(g).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co*

*v. NLRB*, 305 U.S. 197, 229 (1938)).  This deferential standard has been referred to as "'less than

a preponderance of evidence but more than a mere scintilla.'"  *Burns v. Barnhart*, 312 F.3d 113,

118 (3d Cir. 2002) (quoting *Jesurum v. Sec'y of Dep't of Health & Human Servs.*, 48 F.3d 114,

117 (3d Cir. 1995)).  This standard, however, does not permit the court to substitute its own

conclusions for that of the factfinder.  *Id.* (citing *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d

Cir. 1992)).

<u>**Discussion**</u>

To establish disability under the SSA, a plaintiff must demonstrate his or her  "inability

to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period not less than twelve months."  42 U.S.C. § 423(d)(1)(A).

The nature and extent of these mental or physical impairments must be so severe that they

preclude the plaintiff not only from returning to his or her previous employment but also from

acquiring substantial gainful work that exists in the national economy, considering his or her

age, education, and prior work experience.  42 U.S.C. § 423(d)(2)(A).

The administrative law judge follows a five-step sequential evaluation for determining

disability.  The five-step process evaluates the following elements: (1) whether the claimant is

currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe

impairment; (3) if so, whether the impairment meets or equals the criteria of an impairment

listed in 20 C.F.R. pt. 404, subpt. P, app.1; (4) if not, whether the claimant's impairment

prevents him or her from performing his past work; (5) and if not, whether the claimant can

14

perform any other work in the national economy, given the claimant's age, education, and work experience. 20 C.F.R. §§ 404.1520, 416.920.  The burden of proof with respect to steps one through four lies with the claimant, while the Commissioner bears the burden of proof with respect to step five.  <u>Sykes v. Apfel</u>, 228 F.3d 259, 263 (3d Cir. 2000).

In the instant case, the ALJ determined that: (1) plaintiff had not engaged in substantial gainful activity since the alleged onset date; (2) she suffers from the following severe impairments: idiopathic neuropathy, degenerative disc disease, asthma, obesity, coronary artery disease, depression and anxiety with panic attacks; (3) these impairments do not satisfy or medically equal one of the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff is unable to perform her past relevant work as a nurse's aide; and (5) plaintiff has the residual functional capacity to perform work at light exertional level,[15] with certain modifications and could perform other jobs existing in significant numbers in the national economy.  (R. at 22-23.)

Plaintiff raises several arguments with respect to the decision of the ALJ: 1) first, that the ALJ did not give the appropriate weight to the opinions of plaintiff's treating physician and the consultative examiner; 2) second, that the ALJ misrepresented plaintiff's daily activities; 3) third, that the ALJ erred in the characterization of plaintiff's residual functional capacity; and 4) fourth, that the ALJ should have found plaintiff disabled pursuant to Medical Vocational Guideline, "Grid" Rule 201.12.  While the court will address those issues, the thrust of plaintiff's

---

[15]"Light work involves lifting no more than 20 pounds at a time <u>with frequent lifting or carrying of objects weighing up to 10 pounds</u>. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm and leg controls." 20 C.F.R.§§ 404.1567(b), 416.967(b) (emphasis added).

arguments is that the ALJ erred in finding she can do light work when she is only capable of – at best – sedentary work.

        A.       The ALJ's Evaluation of the Medical Evidence

Plaintiff argues that the ALJ rejected the opinions of plaintiff's treating physician and the consultative examiner on the improper basis that "the objective evidence did not identify any condition that would render her as limited as Dr. Scherer opines." (Plaintiff's Brief for Summary Judgment ("Pl.'s Br."), Docket No. 9, at 11).  Plaintiff asserts that there are various records of objective diagnostic tests that point to the seriousness of her condition. Additionally, plaintiff argues that the ALJ inconsistently accepted and rejected the opinions of plaintiff's doctor, the consultative examiner, and an evaluating physician, which concern limitations supporting a finding that she would only be capable of work at the sedentary level.  Plaintiff is primarily concerned with the rejection of Dr. Scherer's and Dr. Ahmed's physical capacities evaluations. Dr. Scherer limited plaintiff to sitting, standing, and walking for only one to four hours per day and occasionally lifting ten pounds, ( R. at 443), and Dr. Ahmed limited plaintiff to standing or walking for one hour or less a day, sitting for thirty minutes a day due to her back pain, and occasionally lifting two to three pounds.  (R. at 273.)  Those limitations are not consistent with the ALJ's finding that plaintiff was able to do work at the light level.  In support of her argument, plaintiff points to the rejected medical opinions and the x-ray and MRI records included in the record.

A cardinal principle guiding disability eligibility determinations is that an administrative law judge accord "[t]reating physicians' reports . . . great weight, especially 'when their opinions

reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" <u>Plummer</u>, 186 F.3d at 429 (quoting <u>Rocco v. Heckler</u>, 826 F.2d 1348, 1350 (3d  Cir.1987)); <u>see</u>  <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000).  The administrative law judge must weigh conflicting medical evidence in determining whom to credit, "but 'cannot reject evidence for no reason or for the wrong reason.'"  <u>Morales</u>, 225 F.3d at 317 (quoting <u>Plummer</u>, 186 F.3d at 429 (citing <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir. 1993)).  The administrative law judge must consider all medical findings that support a treating physician's assessment that a claimant is disabled, and can only reject a treating physician's opinion on the basis of contradictory, medical evidence, not on the administrative law judge's own credibility judgments, speculation or lay opinion.  <u>Id.</u>  317-18.

        A medical opinion, however, is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record . . ." 20 C.F.R. §§ 404.1527 (d)(2), 416.927(d)(2).  In determining whether an opinion by a medical source should be entitled to controlling weight, the following factors are to be considered: the examining relationship, the treatment relationship (its length, frequency of examination, and its nature and extent), supportability by clinical and laboratory signs, consistency, specialization and other miscellaneous factors.  20 C.F.R. §§ 404.1527 (d)(1-6), 416.927(d)(1-6).

        Nonexamining physicians' opinions must be examined to determine whether, and how well, those opinions take account of and explain all the other evidence in the record, including the opinions of treating physicians. The regulations stress:

>[B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).  Therefore, just as greater deference should be given to the opinion of a treating physician over the opinion of a nontreating physician, the opinion of an examining physician should be given greater deference than the opinion of a nonexamining physician.  20 C.F.R. §§ 404.1527, 416.927.

As noted earlier, plaintiff was diagnosed with polyneuropathy, chronic pain syndrome, degenerative disc disease, arthritis in the knee, and obesity. In October 2004, Dr. Hershock opined that plaintiff had patella femoral crepitance, a medical indicator of arthritis.  (R. at 233.) An x-ray of plaintiff's lumbar spine in October 2004 showed degenerative disc disease in L4-5 and L5-S1 with degenerative facet arthropathy. (R. at 174.)  An x-ray of the lumbar spine in January 2005 indicated the same degenerative changes at L4-5 and L5-S1 and also changes at L3-4.  (R. at 192.)  In April 2005, an x-ray of the cervical spine indicated mild right foraminal stenosis at C4-5, minimal disc bulging at C5-6, and some potential foraminal stenosis at C6-7. (R. at 266.)

Plaintiff complained of arm pain consistently starting on February 19, 2004.  (R. at 154.) An MRI of plaintiff's right shoulder in July 2005 showed a full thickness rotator cuff tear.  (R. at 310.)  She was diagnosed with biceps tendonitis.  (Id.)  The rotator cuff tear was later repaired

18

with surgery.  (R. at 389, 425-26.)  Plaintiff, however, continued to experience pain and testified

that it became worse after the surgery.  (R. at 388, 490.)

An MRI of plaintiff's lumbar spine in August 2005 indicated further degenerative

changes including a small right paracentral protrusion at L4-5, an anulus bulge, spondylosis at

L3-4 through L5-S1, and small extraspinal fluid density collections at L2-3 through L4-5. (R. at

433-34).  The MRI showed degenerative changes at L3-4 through L5-S1. (R. at 434.)  Plaintiff

had pain and noticeable swelling in her right and left ankles during August 2005; an x-ray

revealed a heel spur in her right heel.  (R. at 406.)

Plaintiff argues that the ALJ improperly rejected the opinions of Dr. Scherer, her treating

physician, and Dr. Ahmed, an examining physician.  The ALJ explained that she rejected Dr.

Scherer's opinions because "the objective clinical evidence does not identify any condition that

would render her as limited as Dr. Scherer opines."  (R. at 19.)  While plaintiff's treating

physician, Dr. Scherer, reported lesser limitations than Dr. Ahmed reported, Dr. Scherer's

opinions support a finding that plaintiff is only capable of sedentary work, i.e. she was limited to

occasionally lifting and carrying ten pounds.  (R. at 443.)  The ALJ relied upon the opinion of

Dr. Kar.  Dr. Kar, a nonexamining physician, considered plaintiff's credibility based upon,

among other things, plaintiff's statement that she could lift and carry five pounds.  Dr. Kar

checked boxes indicating plaintiff could occasionally lift and carry twenty pounds and could

frequently lift and carry ten pounds.  (R. at 301.)  Dr. Kar did not adequately explain his basis for

those findings.  Dr. Kar did not have the benefit of reviewing Dr. Scherer's April 2006 report

which was prepared more than ten months after Dr. Kar's June 2005 report or her treating

physicians' notes during that ten-month period.

The ALJ stated that she rejected the May 2005 opinion of Dr. Ahmed because it was

given a year before the date of the opinion and "the more recent opinion of the treating physician

[Dr. Scherer's April 2006 report] shows improvement in Claimaint's abilities." ( R. at 19.)  The

ALJ, however, accepted parts of the functional capacities evaluation given by Dr. Kar, a

reviewing nonexamining physician, which was conducted three weeks after Dr. Ahmed's

evaluation and had limitations on occasional lifting and carrying twice as great as those found by

Dr. Scherer.

The ALJ opined:

> [Plaintiff's] coronary artery disease is stable, her asthma has not
> required emergency room care and appears stable with
> medications. . . .  The objective clinical evidence does not identify
> any condition that would render her as limited as Dr. Scherer
> opines.

(R. at 19.)  The x-rays and MRIs of plaintiff's lumbar and cervical spine, however, indicate

degenerative changes from the first test in October 2004 to the last test in July 2005. The ALJ

noted that plaintiff's coronary artery disease and asthma appeared well controlled when

examining the evidence of record.  Those findings do not support the ALJ's determination that

degenerative disc disease, arthritis, arm pain with subsequent arthroscopic surgery, and

polyneuropathy were well-controlled or lacked support in the record.  In light of the objective

medical evidence of record and under the circumstances noted, the ALJ did not have substantial

evidence to afford greater weight to Dr. Kar's opinions than to the opinions of Dr. Scherer and Dr. Ahmed.

B. Plaintiff's Daily Activities

The ALJ rejected Dr. Scherer's and Dr. Ahmed's opinions, in part, because plaintiff could push a grocery cart through a supermarket.  (R. at 19.)  The ALJ concluded that plaintiff "can perform significant activities of daily living, including pushing a grocery cart of groceries through a large supermarket."  ( Id. (emphasis added).)  The ALJ considered that plaintiff was capable of bathing and dressing herself, preparing simple meals, and washing dishes.  (Id.)  Plaintiff, however, indicated difficulty in shopping and that she required assistance of her daughter.  She testified that she could only "push the cart when it's light at first."  (R. at 494.)  Plaintiff testified that she could do "only a little dishes," (id.) and would eat packaged cups of pudding and Jell-O or prepare canned soup.  (R. at 493.)  Plaintiff's daughter testified that she assisted plaintiff in grocery shopping once every two weeks and that her mother would not generally be able to stay in the store the entire time they were shopping and would have to sit in the car.  (R.at 504-05.)  She testified that her sister and she did her mother's housework except for very simple chores, such as sorting laundry.  (R. at 504.) Those kind of activities are not sufficient to undermine the credibility of her treating physician's opinion that she could only occasionally lift and carry ten pounds.  Pushing a cart does not directly correlate to lifting heavy objects.  The activities relied upon by the ALJ do not support a residual functional capacity of light exertional work on a regular and continuing basis.

Being assisted in grocery shopping on occasion and doing minimal housework is not sufficient evidence to undermine the findings of Dr. Scherer's report.  See Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988) (reversible error when ALJ rejects medically credited symptoms based upon claimant's testimony that he "took care of his personal needs, performed household chores, and occasionally went to church"); Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1985) ("disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.").

C.  Plaintiff's Residual Function Capacity and Grid Rule 202.12

Plaintiff argues that she is entitled to a reversal of the ALJ's decision because she has the residual functional capacity to perform, at maximum, sedentary work and has no past work at the sedentary level.  Grid Rule 201.12 provides that a person is disabled if she is closely approaching advanced age, is a high school graduate, and her past work experience is unskilled. See 20 C.F.R. pt. 404, subpt. P, app.2.   Plaintiff was fifty-two years old at the time of the hearing and graduated from high school.[16]

In the situation where a person is "closely approaching advanced age" and is limited to sedentary work, the grid rule is modified and "when such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable

---

[16]A "person closely approaching advanced age" is a person fifty to fifty-four years of age. 20 C.F.R. §§ 404.1563(d), 416.963(d).

skills, a finding of disabled ordinarily obtains.  However, recently completed education which provides for direct entry into sedentary work will preclude such a finding." 20 C.F.R. pt. 404, subpt. P, app.2, 201.00 (g).  At the hearing, the VE testified that plaintiff's past relevant work was at the "medium" exertional level and that her skills were not transferable.  (R. 507.) Plaintiff testified that she did not participate in any formal training or education after she completed high school.  (R. 474.)

If plaintiff is limited to sedentary work, her age, work history and lack of transferable skills would support a finding of disabled under Grid Rule 201.12.  A remand is necessary for the ALJ to reevaluate the weight to be given to the medical opinions of Dr. Scherer and Dr. Ahmed regarding plaintiff's physical limitations.  In light of the ALJ's concerns that the report of Dr. Ahmed, an examining physician, included greater limitations than those found by Dr. Scherer, the ALJ may consider expanding the record to have a consultative exam conducted in order to clarify any discrepancy.  See 20 C.F.R. §§ 404.1517, 404.1519, 416.917, 416.919.

## Conclusion

In light of all the evidence in the record, this court concludes that the ALJ erred in the weight afforded to the medical opinions of Dr. Scherer and Dr. Ahmed.  A remand is necessary for the ALJ to determine whether plaintiff is capable of more than sedentary work, especially with respect to lifting and carrying limitations.  Summary judgment will not be entered in favor

of plaintiff (Docket No. 8) or defendant (Docket No. 14). The decision of the ALJ will be

reversed and this case will be remanded for proceedings consistent with this opinion.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: July 22, 2009